Good morning, Your Honors. May it please the Court, Alexandro Robert Gordon, on behalf of Defendant Appellant Cross Alpaoli, Attorney General Becerra. If it's acceptable to the Court, I would like to reserve four minutes for rebuttal. For the second time in this case, the District Court has enjoined the Attorney General from demanding a copy of Thomas More Law Center's Schedule B that's already on file with the Internal Revenue Service. The permanent injunction in this case is based on numerous legal errors, and many of the same legal errors as the preliminary injunction that was vacated by this Court. The District Court's order is in direct contravention of this Court's holding in Center for Competitive Politics, as well as the earlier decision in Americans for Prosperity Foundation v. Harris, and decades of controlling Supreme Court and Ninth Circuit precedent. The District Court's order is thus an abuse of discretion, and we respectfully request that the Court reverse the District Court's judgment, vacate the permanent injunction, and direct the District Court to enter judgment for defendants. As the Court is aware, the Attorney General is the primary regulator. Well, let's do that now, Judge Fischer. So, first, there are a few things about that. Yes, the District Court did rely very heavily on confidentiality as part of its analysis. That analysis is not tethered to any actual First Amendment analysis, which, of course, is what the claim is here. So, a few things. The idea that there's any meaningful risk of disclosure from submitting a Schedule B to the Registry is not supported by the record. Simply, clearly erroneous to suggest that it is. This Court, even before the adoption of a formal regulation which codifies the previous confidentiality policy, has found that the confidentiality policy is adequate, and that it the Attorney General only seeks this information for public use. But as it turns out, I guess in the record it was established at trial that there were, I think it's referred to as inadvertent disclosures. Is that right? And that even right up to, it was like right before the trial started, or right when the trial was underway, there were more disclosures that were identified. That is what the District Court describes, Judge Pius, yes. What is actually the case is that through the years, Plaintiff's expert, through what he called quite an effort, hundreds of hours of work, discovered that some documents that should have been only in the private-facing website were actually inadvertently posted to the public-facing website. The total number is less than 1,800 of things that were inadvertently posted, so that theoretically someone could have seen them, although there is no evidence that anyone did, or that any harm came from that. Was there anything in the record that indicated that somebody, it was possible that somebody could have seen those documents? There is nothing, I mean, it's always possible, but there is nothing in the record that suggests that anyone did see those documents. This Court, looking at evidence of, I think it was 1,471 disclosures inadvertently, sort of theoretically posted to the public-facing website, said that that kind of evidence of a breach is just too speculative to support an injunction. So having less than three, or fewer than 300 more, I'm not sure really changes that it's less than speculative. Let me ask you this, Counsel, because the difference between this case and the prior case is that now there's a fully litigated trial on the merits with a factual record. And from that factual record, the District Court essentially made certain factual findings that we would view for a clear error. So I share Judge Fischer's concern regarding the government's ability to maintain confidentiality. The District Court's finding is that essentially there were extensive disclosures of the Schedule Bs even after explicit promises to keep them confidential, and the AG's current approach to confidentiality essentially results in obvious and profound risks of further inadvertent disclosure. So I take it that your argument is that that particular factual finding is not supported by the record. And the record does show that there were inadvertent disclosure, in the sense that some 1,700, 1,800 Schedule Bs were on a, I don't know if it's called a website, but publicly accessible, let's take it that way, and over 1,000 or 1,500 additional confidential documents were also publicly accessible. So that's the record, that's the finding. Explain to me how that's still speculative. Or is the argument that the risk of disclosure percentage-wise is so low that there's not any real risk here? I'm not sure I'm fully getting your argument. All of the above. Right, it's because those disclosures that the district court identified account for less than one-tenth of one percent of all documents on the website. So it's incredibly speculative, and it does not support a finding that there's sort of rampant inadvertent disclosure to suggest that a confidentiality policy that's working 99.9 percent of the time is a failure. So that we really need to worry about the sort of highly theoretical and speculative risk that anybody actually did see any of these postings on the website, and that any harm came to anyone. Because again, even if we accept it is a clearly erroneous finding. It is in no way supported by the record. And also just to get back, Judge Pius, to the eve of trial, even that is unclear. The upload dates, and this is in the record, for those disclosures that were supposedly discovered on the eve of trial, none of them were actually in the later part of the year. They were not in 2015. They were not in 2016. Two of them had already been discovered by the registry and taken down by the time plaintiff's expert actually testifies. So it's not really clear that these are disclosures that are going to the eve of trial. And what the evidence also shows is that whereas there was a time when the registry was switching from paper to going to the web where there was a tremendous amount of uploading, and that is where the greatest number of errors actually happen, there were no uploads that shouldn't have been put in the public-facing website discovered in 2016. So you're seeing increased protocols, increased procedures, and you're seeing that it's actually working. So now instead of being at 99.9 plus percent, we've actually gone even closer to 100 percent, which is the goal. So that's the first part, is to say that factually it's just not supported in the record for all the reasons that I've just said and all the reasons that are contained in our brief. When you started off on this discussion, you made reference to the expert that was put on and that it took him a major, what did you say, how did you characterize it, a major effort? Hundreds of hours, and in his own words, quite an effort. He had to get more extensive. So was there anything in the record, somebody who, you know, like for example, if I went on the record and I just wanted to see what was publicly available, would it be a major burden to uncover an inadvertent public disclosure? Potentially, yes. Yes, Judge Price, it would. Because first of all, what the expert did was downloaded the entirety of the something like two million documents that are on the website and then spent hundreds of hours checking. When most people, and I assume what Your Honor would do, would be you would get onto the website, you would go to the charity that you want to see the information that you want to have, and there's no reason to think actually that there would be anything that you could click on that you shouldn't be able to click on in any given charity. So you really, really have to be digging. You need enhanced computing power. You need a staff of people to help you. So I just want to get back to sort of a final point, which is that even if this weren't clearly erroneous factually, and it is, this Court has said in Americans for Prosperity and other courts have said the same, that that's not the end of the inquiry. Because of course, let's assume then that we're talking about public disclosure, which we're not, but let's assume for the sake of argument that we are. Thomas More Law Center has to show, of course, that public disclosure has led to a reasonable probability that its First Amendment rights have been chilled. It has done no such thing. In fact, half of its donors are private foundations. They're on Schedule B, and they're required to actually disclose publicly their contributions. And there is zero evidence of anything happening to anyone who has been publicly disclosed as a donor to Thomas More Law Center. And the evidence at trial bears that out. So again... They've actually over disclosed, haven't they? They have, Judge Fischer. They could use the 2% figure, which means that usually they would only need about $38,000 to show up on Schedule B. But when asked, well, are you concerned about the fact that you've been over disclosing? Their president said no, because nothing has ever happened to any donor as a result of being on Schedule B. So it's really just not plausible to suggest that even if this were a public disclosure, that it would lead to any First Amendment harm. I am almost out of time, but just to be... Can I ask a quick question regarding another finding relied on by the district court, which is the purported ready access to Schedule B by other means? Does the record demonstrate that the AG has ready access, or is this a process that really takes... Either takes weeks if you get it directly from the IRS, or really dependent on the organization's willingness to cooperate if you seek it directly from the charity? So, Your Honor, first of all, the fact that the Attorney General, under exacting scrutiny, and particularly where there's been no showing of First Amendment harm that's cognizable, the fact that there could be alternate means is legally irrelevant. Even under strict scrutiny, which doesn't apply here, those alternate means would have to be as effective as what we have here. And there's ample testimony in the record that, in fact, trying to get it directly from the IRS, for example, can take months. And trying to get it directly from a charity can take anywhere from months to years to never, during which time the charity is busy doing whatever illegality, potentially, and wasting assets that you were trying to stop in the first place by investigating them. So, as this Court has found in Center for Competitive Politics, there are significant efficiencies to be gained by having the schedule B up front. Because the schedule B, often, both of itself and when looked at with the full 990, provides red flags and tells you whether you need to investigate or not, how to structure your investigation. Sometimes it can show self-dealing, really, when looked at with the 990. So, yes, there is evidence in the record that we have cited to in our brief, and I can certainly, when I come back on rebuttal, point the Court to it more exactly. Would you like to save the balance of your time? I would, if that's all right. Okay, yes. Thank you. Thank you. Good morning, and may it please the Court. I'm Louis Castoria of the firm of Kauffman, Dulwich, Wallach, LLP. Appearing with me today as counsel for appellee and cross-appellant, the Thomas Moore Law Center, is Mirian Cruz of the same firm, who also co-tried the case in the district court with me. I would like to request two minutes to be reserved in my time, and I know that means when the yellow light goes on. I'd like to reserve those minutes, if I may. In our brief time together this morning, I'd like to hope to present three main topics. The first is how Thomas Moore Law Center did establish its suprema facie case in the trial court, including some of the issues that members of the Court have asked the Attorney General's counsel about. Whereas the Attorney General utterly failed to establish a direct connection between the collection of nationwide Schedule B donor lists to the function of regulating charitable. I think we've already crossed that hurdle, so be sure you do focus your time on the evidence. I will, Your Honor. Thank you. And that raises a point I also wanted to make, which is this Court did not completely overrule the preliminary injunction that the district court entered. It was overruled in part. It was left in place in part. And that meant that the Court found that the predicates for an injunction were established by Thomas Moore, even at the preliminary injunction. That was pending a trial on the merits. Yes, Your Honor. So now we're at a trial on the merits. We did it. Right. So now we're looking at the trial record, as Judge Wynn just mentioned. I'm just pointing out the fact that the earlier ruling on the preliminary injunction does not foreclose this Court from looking at the trial record. In fact, quite the opposite. The second point I would like to explain briefly is the relevance of the recent Supreme Court Masterpiece Cake case. And lastly, I'd like to discuss briefly with the Court the importance of anonymous speech in free speech and free exercise of religion cases, which overlap, as this one does. Allow me to address a couple of points that members of the Court have raised. The Attorney General was asked what has been done to protect confidentiality, both up to the time of the trial and perhaps even since. At the trial in the Thomas Moore case, the Attorney General's own witnesses, despite their repeated statements in briefing, including before this Court, that every case that gets looked at, the schedule B, is crucial to the investigation. The witnesses on the stand admitted they could only come up with five, a handful of cases, where they were sure it was even referred to. And as it turned out, all but one of those cases was not about a public charity, public trust, like the Thomas Moore Law Center. They were about private trust, where there's a much greater risk of the donor or founder putting his or her money into a trust for the benefit of a family member. And the Attorney General gave good examples of cases like that. That's not our case, though. They found one. On a percentage basis, if we want to say that the 1,700-some-odd confidential schedule Bs that were exposed to public scrutiny by the Attorney General is too small a number, how about just one case in the history of the Attorney General's office in which a schedule B was referred to in a case involving a public trust like the Law Center? If you want to go by the math, I think we come out better on that. Let's talk about the evidence of the impact, if any, on the Law Center of any inadvertent disclosure. I didn't see any evidence of, certainly not significant evidence, of actual donors or potential donors who have refused to give or have been in any way affected in donations. Can you help me out on that? We put evidence in from two sources of actual donors, one, Tom Monahan, who was the founder of the Law Center. His business was Domino's Pizzas, and because of the position Domino's took on a number of subjects, there was a public boycott that desperately hurt that business. Mr. Monahan personally did not suffer physical injury or harm, but his business was boycotted. I understand he also said it hasn't affected his giving activities. Tom Monahan is Joan of Arc back again. Nothing is going to deter his advocacy, but not everybody can be Joan of Arc, Your Honor. How does that help your case? It seems to hurt your case. It seems to me that the usual donor who gives anonymously and is told by the Law Center that their privacy will be respected and who doesn't know that their information is going to the California Attorney General's office where it's put into a sieve to leak, that donor doesn't appreciate the niceties of Schedule B or Form 990. They just know if my information is getting out and may get out to the public, I may have a risk. And on this, the evidence at trial is crystal clear. The only evidence was that a number of people associated with the Law Center whose names were public in part because they did advocate publicly, had horrible things happen to them. The donors whose information was uploaded by the Attorney General to the public-facing website, we don't even know who they were. So it's hard to connect the dot there. But here's the point, Your Honor. The only evidence, the uncontradicted expert testimony of expert Paul Shervish, the sociologist who did the only peer-review study of anonymous donor behavior done up to that point in time, opined based on his study and work that the donors to the Law Center have a reasonable expectation that their identities and their information will be kept private, that if they knew that it was being disclosed to State Attorney Generals, they'd be less likely to donate, and that this chilling effect is even more strong in a case where the subject is religion because we're in a very divisive society and divided society. We know that, counsel. I'm looking for evidence. Your president testified, as I understand it, he doesn't recall ever having had a conversation with a potential donor in which they expressed hesitation about giving to the Law Center as a result of controversy or fear of reprisal. Is that true? He did testify to that, Your Honor. But bear in mind, please, that he's talking to donors who have no idea that the California Attorney General is asking for their identities at that time. So there's no evidence of donors hearing about the leaks or being aware of the litigation in this case? There's nothing in the record. Do you have any donors who said, until you all get this resolved, I can't give? We have the one donor who gave $25 anonymously. He put cash in an envelope without a return address and said, I'm giving it to you this way because if I gave you a return address, you'd put it in your database and somebody could hack it. And ISIS is out there looking for people like us. And that's true of the IRS, too. ISIS could attack or hack the IRS, too. It wasn't focused on California. But that's also something as a matter of federal law that the law center has to disclose to the IRS. And there's a criminal penalty if anybody at the IRS abuses that information or lets it loose. There is no penalty in California, even under the statute, the regulation, I should say, that Justice Windham is pointing to. There's nothing that says there's a criminal penalty, there's no civil penalty. There's not even any mandatory disciplinary process to punish somebody who intentionally takes a Schedule B and puts it in the Los Angeles Times. Well, counsel for the AG had argued that the risk of inadvertent disclosure, even before the plaintiff's expert, I think Dr. McClave, had done his intensive hundreds of hours of trying to search publicly available databases, even before that the risk of inadvertent disclosure was a really, really small percentage of the documents available that are considered to be confidential. And then since then, protocols and procedures have been put in place to reduce that risk even further. So it was like 99.9% effective. Now it's approaching close to 100% in terms of effectiveness of keeping the information confidential. So why isn't that record sufficient to undermine or fatally undermine the district court's finding that the risk of disclosure is too high, it's intolerable? Your Honor, Mr. Eller, the registrar, the current registrar of the AG's office, testified at trial in a cross-examination. I asked him the question about the regulation, which at the time of trial had just been approved and put on the books. It had been proposed before, but by the time of trial it was there. And I asked him, is there any document at all that protects Schedule Bs from being disclosed to the public again, intentionally or inadvertently? And he said no. He said no. And we know from the other people who testified, as I mentioned, no criminal penalty, no civil penalty, no regulatory discipline. And yes, an expert took a lot of time to get into the system and find out how to get Schedule Bs specifically. But he also testified, anybody else could have done it. It was all you needed was a browser, and you could do it. And bear in mind, he was looking for a huge universe of documents. He wasn't looking for Thomas More or AFPF or the Peace Corps. He was looking for the universe of documents. And it took a very long time to get that huge universe found and downloaded. Somebody looking just for Thomas More might have better luck than that and take a little less time. And he said anybody with a browser could do it. That hasn't changed. There's no evidence that that has changed. And the witnesses admitted that even this new regulation is only declarative of our existing process and policy. So no difference. You had a cross appeal, correct? Yes, Your Honor. Did you want to address that? I do. Because your time is running out. I know. Well, we have preserved several issues for purposes of appeal. I'm not going to address all of them. I do want to address the prevailing party issue on attorney's fees under Section 1988 of 42 U.S.C. The law center did prevail in the preliminary injunction. Part of that injunction is, in effect, as we sit or stand here today. The permanent injunction is, in effect, subject to what happens today. The law center did prevail. There is a change in the relationship of the parties. And the cases we've cited in our reply brief make it clear that you don't have to find damages or anything more than injunctive relief for a prevailing party status. So we do believe, as much as we respect the trial court's decision in every other respect, we do believe that it was mandatory that attorney's fees be awarded. We also believe, and we've cited cases on this point, that a strict scrutiny standard was not applied by the trial court. He expressly denies applying it. And if you look at the analysis, it's not a strict scrutiny analysis. However, where free speech... When he was talking about narrow tailoring, what was he referring to? Well, narrow tailoring is an aspect in strict scrutiny. But there's also, outside of strict scrutiny, a necessary fit. As the Supreme Court said, I can't remember the case at the moment, but it's important that the remedy fit the circumstance, even without strict scrutiny. Here we have a remedy that's the most overbroad, and in terms of its effect, draconian, you can imagine. We're going to take away your license. We're going to sue your officers and directors. We're coming after you because you didn't give us a document that we've only used once in our history. That is not an important governmental objective. There's no tie between collecting those Schedule Bs. And, in fact, the attorney general's... I will use a little more of my time. The witnesses admitted in every case they cited to where they did something about it, they did have alternate means, one of which was the telephone, which has been around a long time before the Internet. They get their leads not from Schedule Bs. No Schedule B has ever been used to initiate an investigation. But once one is initiated, they don't go to Schedule B to get the information. They call the media source who has reported the problem, or they go to the whistleblower who brought it to their attention. And I will try to reserve my 13 seconds. Thank you. A few things, Your Honor. As promised, Judge Wynn just wanted to direct the Court's attention to where the testimony and evidence is about the fact that these alternate procedures, such as a subpoena and an audit, are less effective. That can be found at ER 512-13, 546-47, 1110-1111, and 1226, some of the testimony on that point. So I think as illustrated both in the trial and during this argument, there is no cognizable First Amendment harm flowing to Thomas Moore Law Center's donors from the Schedule B reporting requirement. And because there's no cognizable harm, which is a very demanding burden to meet, if one wants an exemption from a generally applicable and, in this case, facially constitutional reporting requirement, one has to come up with very serious and severe harm that is tied to the disclosure at issue that the government is unable or unwilling to control and that actually threatens the very existence of a movement, right, to the point where a movement cannot survive and its ideas will be removed from the marketplace. That has not come close to being established here. And because it has not, this Court is solidly within the parameters and is bound by a Center for Competitive Politics, which says that the Attorney General has a compelling interest and that the reporting requirement is substantially related to that interest. It is not actually the case that, in fact, Schedule B has only been used five times in recorded history. And we have explained the reasons why that is a misleading fact. But frankly, and particularly in light of the fact that there is no appreciable harm from the Schedule B reporting requirement, that would be more than enough. There's actually testimony from both the current and the former head of the Charitable Trust Section that upon getting a complaint, and again, there's no requirement that this be done pre-complaint, the first thing that an investigator will do or an attorney is look at the entirety of a 990, including Schedule B. One of the five examples, the Deputy Attorney General testified that Schedule B was a critical document in uncovering a $200 million gift-in-kind scam. So that would be enough under exacting scrutiny. Finally, just to get back quickly to the confidentiality issue, I do want to point out that the District Court in its Thomas Moore Law Center order actually acknowledged that there was a formal regulation and acknowledged the increased protocols and protections that the Attorney General has put in place and has said that they're commendable. But the issue just seems to be that because there were a tiny fraction of past possibilities of someone seeing it and the fact that we can't give a 100% guarantee that there will never be a mistake again, that that is enough then for an injunction. That is speculative. That is not the standard. Finally, with respect to the cross-appeal, all of plaintiff's claims fail for the reasons that we've stated, and the fee portion is completely premature in that no fee motion has been made for the District Court to rule on. If the Court has no further questions, we will submit. I don't think there are any questions. Thank you. On your cross-appeal, she had very little to say, so you only get to rebut on the cross-appeal. Very well. Thank you. Relevant to the cross-appeal, we would appreciate if the Court's ruling would include the ruling on the two pending motions, the judicial notice and the motion to strike. Okay. Thank you. Cross-appeal only. I need talks, Your Honor. Attorney's fees. Thank you. Thank you. Thank you, Counsel. On this case, Thomas More Law Center v. Becerra is submitted at this time, and now we'll just move on to our next one, which raises very similar issues. Americans for Prosperity Foundation v. Becerra.
judges: Fisher, Paez, Nguyen